**AMERICAN OPTICAL CO. et al. v. UNIVERSAL OPTICAL CORPORATION.**

**STEVENS & CO., Inc., v. HOLMES et al.**

(Circuit Court of Appeals, First Circuit. May 28, 1920.)

Nos. 1456, 1457.

1. Patents ⊂⊃328—1,177,367 for eyeglass mounting not infringed.

The Stevens patent, No. 1,177,367, for mounting for eyeglasses and spectacles, *held* not infringed.

2. Patents ⊂⊃328—1,241,717 for eyeglass mounting void for lack of invention.

The Day & Carson patent, No. 1,241,717, for mounting for eyeglasses and spectacles, claims 4 and 11, *held* void for lack of invention, in view of the prior art.

Appeals from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Suit by the American Optical Company and others against the Universal Optical Corporation and by Stevens & Co., Incorporated, against Clarence L. Holmes and others. Decree for defendant in each case, and complainants appeal. Affirmed.

In Case No. 1456:

Harrison F. Lyman and Frederick P. Fish, both of Boston, Mass., and Harry H. Styll and H. K. Parsons, both of Southbridge, Mass., for appellants.

C. Schuyler Davis, of Rochester, N. Y. (Davis & Simms, of Rochester, N. Y., on the brief), for appellee.

In Case No. 1457:

C. Schuyler Davis, of Rochester, N. Y. (Davis & Simms, of Rochester, N. Y., on the brief), for appellant.

Harrison F. Lyman and Frederick P. Fish, both of Boston, Mass., and Harry H. Styll and H. K. Parsons, both of Southbridge, Mass., for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. These cases were tried together. In No. 1457 the plaintiff charges the defendants with having infringed letters patent No. 1,177,367, which it owns, and which was issued to F. A. Stevens March 28, 1916, on application filed January 12, 1916, for improvements in eyeglasses and spectacles. The defenses are noninvention and noninfringement.

[1] There are three claims in issue. They all relate to mountings for spectacles and eyeglasses in which a metallic frame, consisting of eye wires, a bridge, end pieces, and bows, is combined with nonmetallic eye rims of shell or zylonite. The claims are as follows:

"2. In eyeglasses or spectacles, the combination with the lenses, of nonmetallic rims surrounding the lenses and provided with grooves adapted to receive the edges of the lenses and provided with peripheral channels, and metallic rims surrounding the first rims and seated in the channels.

"3. In eyeglasses or spectacles, the combination with the bridge, of metallic rim sections, means for connecting the ends of the rim sections, transversely split nonmetallic rims embraced by the rim sections, and lenses embraced by split rims.

"4. In eyeglasses or spectacles, the combination with the lenses, of transversely split nonmetallic rims engaging the lenses and provided with recesses, metallic rim sections embracing the rims, members upon the adjacent ends of the sections, means for connecting the members to form end pieces, and extensions on said members registering in the recesses."

The Stevens device consists of shell or zylonite rims having an inner groove to receive the lenses and an outer groove in which the metal eye rims are placed, that surround and hold the zylonite or lens-holding rims. The metal bridge and end pieces are made integral with or are soldered to the sides of the metal eye rims. Both the metal and nonmetallic rims are split to permit the insertion of the lenses and, when the metal end pieces are secured together, each of the nonmetallic rims is clamped and held in place by the metal rims sunk in their outer grooves. By employing the metal frame Stevens gave strength to his mounting and by locating the metal eye wires in the outer groove of the zylonite rims he clamped and held the latter in position, thereby dispensing with screws and rivets to hold the parts together.

In the court below it was shown that the particular outside location of the metal eye wires was functionally important, and as this feature of surrounding and clamping the nonmetallic rims with the metallic rims was included in all the claims in issue, they were limited to a structure in which the metal and nonmetallic parts were thus assembled and held together; and, being thus limited, that the Windsor frame, the alleged infringing device, in which the metallic eye wires are sunk in an interior groove of the nonmetallic or zylonite rims, and in which the ends of the zylonite are secured to the metal end pieces by screws, did not infringe. In this conclusion we fully agree, and find no occasion for considering the validity of the patent.

[2] In No. 1456 the plaintiffs charge the defendant with having infringed letters patent No. 1,241,717, issued to Day & Carson October 2, 1917, on application filed August 11, 1916. This patent is owned by the plaintiffs, and is for improvements in eyeglasses and spectacles. The defenses are anticipation, noninvention, and noninfringement.

There are six claims in issue, Nos. 1, 4, 7, 8, 10, and 11. These

claims, as those in No. 1457, relate to mountings for spectacles and eyeglasses in which a metal frame, consisting of eye wires, bridge, end pieces, and bows, is combined with nonmetallic eye rims of shell or zylonite. We need only refer to claims 4 and 11, which are typical of the other claims and read as follows:

"4. In an opthalmic mounting, the combination with a metallic lens receiving frame, of a nonmetallic ornamental frame extending therearound and means for positively uniting the frame members one to the other."

"11. In an opthalmic mounting, a pair of continuous metallic eye wires, abutments at the ends of said eye wires, means for securing the abutments together, a pair of nonmetallic eye wires encircling the metallic eye wires and terminating at the abutments thereof, means for holding the nonmetallic eye wires in place on the metallic eye wires, and a bridge uniting the two metallic eye wires."

Day & Carson employ an all-metal frame. In one form of the device the metal frame is shown in the drawings as having metal eye wires with an inner groove to receive the lenses and an outer groove to receive the nonmetallic or zylonite embracing rim. The metal and nonmetallic rims are split to permit the insertion of the lenses, and, because the zylonite or nonmetallic rims are on the outside, special provision is required for securing their ends to the metallic end pieces. The outer rims in this form are also to some extent reinforced by flanges on the metal rim. In another form the metal rims have an interior groove, but, instead of being grooved on the outside, they are beveled; and the nonmetallic rim has an interior groove in which the bevel of the inner rim is adapted to fit.

In the court below it was held that, in view of the state of the art and the disclosures in the prior patent to Stevens, no problem involving invention was solved by Day & Carson by putting zylonite strips on an old structure like the ordinary metallic spectacle frame, unless it resided in the specific means employed to keep the strips in place; that, as the claims in issue were broad claims, and did not specify any specific means for keeping the zylonite strips in place, they were invalid unless limited to the specific means disclosed; and that, thus limited, the device of the defendant, the Universal Optical Company, did not infringe, as it did not employ the specific attaching means of, the Day & Carson patent.

It appears that the structures called for by the Day & Carson patent have never been put on the market. The plaintiffs' commercial structure is the Windsor frame, which has met with large success. It is the success of this frame which the plaintiffs rely upon, in a large degree, as evidence in support of the validity of the Day & Carson patent. The plaintiffs, however, own another patent specifically covering the Windsor frame, and, unless the Day & Carson patent can be said to involve some new problem of construction of a fundamental nature, justifying the broad claims here in issue, the commercial success of the Windsor frame is of no importance.

In view of this, the plaintiffs seek to support the validity of the broad claims of the patent by asserting that one of the new problems involved in the Day & Carson device, in addition to that of providing means for attaching the zylonite strips to the metal eye wires, was the

problem of securely clamping and holding the lenses in position in the frame; that it is of great importance, in the case of a lens having a cylindrical correction for astigmatism, that the axial alignment of the lens be at all times correctly maintained; and that a metal mounting will do this, while a zylonite mounting, like the Stevens patent and other prior art devices, will not, as zylonite is likely to twist and shrink. This idea, however, is nowhere referred to in the patent, and the court below, in view of the very general use of zylonite through a period of years as a lens-holding means, found it to be the equivalent of the metallic rim for such purpose, and that the substitution of one for the other did not involve invention. It is also probable that the patentees, when they applied for this patent, regarded metallic and zylonite rims as lens-holding means to be equivalents, for, under the broad language of claim 11, they apparently reserved to themselves the right to use the zylonite encircling rim as a lens-holding means.

However this may be, we are nevertheless of the opinion that the conclusion reached by the court below as to the invalidity of these claims was right. If the metal eye rim of the old metallic frame rather than the zylonite rim was more likely to hold the lenses securely, we do not think it involved invention to ornament it by sinking it in an interior groove of a zylonite rim, Stevens having disclosed how such a frame could be ornamented by sinking it in an exterior groove of a zylonite rim, for, if the eye rims of the metallic frame were sunk in interior grooves of the zylonite rims, it was apparent that the lenses would be held by the metallic frame, unless special care was taken to avoid it. As we think these broad claims are invalid, there is no occasion to discuss the question of infringement.

In each case the decree of the District Court is affirmed, with costs to the appellees.